UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────────

| | |
|---|---|
| VERIVEND INC., | **DECLARATION OF RODNEY R. REISDORF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiff, | |
| v. | |
| JACOB LEVI CLAVER and DIGITAL ASCENSION GROUP LLC, | |
| Defendants. | Civil Action No. 1:23-cv-01289 |

───────────────────────────────────────────

RODNEY R. REISDORF, pursuant to 28 U.S.C. § 1746, declares:

1. I am the Chief Executive Officer of Plaintiff Verivend, Inc. ("Verivend").

2. I submit this Declaration in support of Verivend's motion for a temporary restraining order and preliminary injunction.

**A.      Verivend**

3. Verivend operates a payment processing platform for businesses to raise capital, pay distributions, and deploy capital.

4. Verivend is the owner of a federally registered trademark for "VERIVEND" (the "Verivend Mark"). A true and accurate copy of the Verivend's registration for the Verivend Mark is attached as **Exhibit A**.

5. Verivend owns and operates the domain "verivend.com" in connection with its services (the "Verivend Domain").

### B.     Claver Opens Verivend Accounts

6. On or about September 19, 2023, Digital Ascension Group LLC ("Digital Ascension") and Verivend entered into a Software as a Service Agreement (the "Agreement"). The Agreement was signed by Jacob Claver ("Claver").[1] A true and accurate copy of the Agreement is attached as **Exhibit B**.

7. Claver, acting through Digital Ascension, opened several accounts on the Verivend platform.

8. Section 2.3 of the Agreement provides that "nothing in the Agreement grants . . . to [Defendants] or any third party any Intellectual Property Rights or other right, title, or interest in or to the Verivend IP."

9. Section 2.4 of the Agreement provides, in relevant part, that Verivend may suspend access to its services if Defendants are "using the Services or Verivend IP in violation of the Agreement or for fraudulent or illegal activities."

10. Further, under Section 3 of the Agreement, Defendants agreed that:

> [Defendants] shall not at any time, directly or indirectly, and shall not permit any Authorized User or other person to . . . use the Services or the Verivend IP in any manner or for any purpose that infringes, misappropriates, or otherwise violates any Intellectual Property Right or other right of any person, or that violates any applicable law.

11. The Agreement also contains an indemnification provision. Section 9 of the Agreement provides that:

> [Defendants] shall indemnify, defend, and hold harmless Verivend from and against all losses, damages, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the costs of enforcing any right to

---

[1] Claver and Digital Ascension are collectively referred to as "Defendants."

indemnification hereunder arising out of, related to, resulting from, or in connection with: . . . (ii) [Defendants'] negligence or willful misconduct; (iii) [Defendants'] violation of law; (iv) [Defendants'] breach of the Agreement . . . ; (v) [Defendants'] improper use of the Services; (vi) any act or omission of [Defendants] or any Authorized User; (vii) actions taken or omitted in reliance upon any oral or written communications from [Defendants] or any Authorized User . . . and/or (ix) [Defendants'] violation of any laws and regulations, including, but not limited to, any applicable anti-money laundering and/or securities laws and regulations.

12. Section 11.2 of the Agreement provides that "Verivend may terminate the Agreement, effective on written notice to [Defendants], for [Defendants'] breach of Section 3 of this SaaS Agreement, without any cure period."

13. Section 12.13 of the Agreement also provides that:

The Parties agree that in any dispute exclusive jurisdiction and venue will be in the state or federal courts located in Erie County, New York. The Parties mutually acknowledge and agree that they will not raise in connection therewith, and hereby waive, any defenses based upon venue, inconvenience of forum, or lack of personal jurisdiction in any action or suit brought in accordance with the foregoing.

14. In addition to the Agreement, Claver caused Digital Ascension to execute an Order Form, whereby Defendants agreed to Verivend's Acceptable Use Policy and its Terms and Conditions. True and accurate copies of Verivend's Acceptable Use Policy and its Terms and Conditions are attached as **Exhibits C and D**, respectively.

15. Pursuant to Verivend's Acceptable Use Policy, Defendants agreed "not use the Verivend service for activities that . . . Violate any law, statute, ordinance or regulation."

16. Verivend's Terms and Conditions provide that Verivend's "trademarks, service marks, and logos" may not be "copied, reproduced, aggregated,

republished, uploaded, posted, publicly displayed, encoded, translated, transmitted, distributed, sold, licensed, or otherwise exploited for any commercial purpose whatsoever, without [Verivend's] express prior written permission."

17. Verivend's Terms and Conditions also provide that Defendants shall not "use the Services or the Site in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law, regulation, or rule."

18. Further, under Verivend's Terms and Conditions, Defendants are prohibited from posting or submitting content that is:

1. False, misleading, deceiving, inaccurate or dishonest.

2. Defamatory or invasive of another person's right of privacy or right of publicity. . . .

5. Illegal . . . .

6. Infringing intellectual property or other proprietary rights of any party, or not authorized, such as content that you did not create or do not have the permission to use . . . .

7. Creating a privacy or security risk to any person.

8. Spam, letters, or pyramid schemes.

9. In Verivend's sole discretion, objectionable or exposes users to harm or liability.

**C.  Defendants Falsify Emails and Wire Transfers Purportedly from Verivend and Falsely Claim Communications with Verivend in Connection with Purportedly Raising Capital for xSPECTAR**

19. On November 30, 2023, Verivend received a call from Dirk Schepens ("Schepens"), the manager of Monic Sarl, a company based in Luxembourg.

20. Schepens told Verivend that Claver was purportedly raising capital for xSPECTAR using his accounts with Verivend. Schepens was promised an investment that he had never received, and Claver had blamed Verivend for purportedly failed or delayed wire transfers. At the request of Verivend, Schepens provided Verivend with copies of emails and screenshots of his conversations with Claver. True and accurate copies of these emails and screenshots are attached as **Exhibits E and F**, respectively.

21. The emails and screenshots provided by Schepens revealed that Claver had been fabricating purported Verivend wire transfers and communications with Verivend. Indeed, Claver had created a fake Verivend email and impersonated Verivend employees to fabricate alleged emails and wire confirmations from Verivend.

22. Upon information and belief, Claver did not raise any capital for xSPECTAR using the Verivend platform.

23. Although Claver had an account on the Verivend platform under the name "JM Equity Venture LLC - XPECTAR," there were no wire transfers to/from that Verivend account.

24. As an example of the information provided by Schepens, on November 7, 2023, Claver sent Schepens a picture of a Verivend wallet indicating $1,075,310.00 as "Fully Paid." Upon information and belief, this image was either for an account unrelated to xSPECTAR or Claver had manufactured the image.

25. Further, on November 10, 2023, Claver sent Schepens a picture of a Verivend wallet dashboard, showing an available balance of $1,075,310.00. Again, upon information and belief, this image was either for an account unrelated to xSPECTAR or Claver had manufactured the image.

26. Claver and Schepens then had the following exchange:

Claver: "Capital is back in my account… Rodney [Verivend CEO] said they [Verivend] fat fingered the IBAN number after reviewing it.. What [sic] me to push again that way or move to my bank account and convert to USDC?"

. . . .

Schepens: "So no idea what issue can be… my bank is aware and has contract and all good with it… regularly make these transfers and never had issue[.]"

Claver: "It was verivend."

Schepens: "It should be in in 24h normally…"

Claver: "Yeah max ive ever seen is a couple days. Weve had other issues with incoming international wires and ive never sent one out before[.]"

Schepens: "No worries… hope you had a good flight… and can stress them to make sure it gets to us in next 24h [symbol] as it should be…"

27. Claver's statements are false. The purported communication between Claver and me never happened. Further, Verivend never "fat fingered" an IBAN number on a transaction for Claver, and I never made any communication suggesting they did.

28. On November 15, 2023, Claver texted Schepens: "Just got off with them [Verivend] and they said it could take up to 3-5 days. Went out Monday bc of the holiday on Friday[.]"

29. Claver's statement is false. This purported communication between Claver and Verivend on or around November 15, 2023 never happened.

30. On November 20, 2023, Claver sent an email to Schepens stating "Verivend has the funds and is moving the funds back into my account. I will be removing them as we discussed and sending them myself asap."

31. Claver's statement is false. Verivend did not communicate to Claver that it "had the funds" or that it was going to "move funds back into" his account.

32. Claver's email to Schepens also contained an image purporting to be a screenshot of a November 20, 2023 email from "Jon Ebel <jon@verivend.support>" to Claver, with a subject of "Xspectar wire info."

33. This purported November 20, 2023 email contained what appeared to be an image of a wire confirmation and stated the following:

> Per our phone conversation please see the confirmation below. I see the funds back on our side again this morning, and will get them back into your account. After review of the wire information, it looks like we incorrectly entered the IBAN number and that's why it has been rejected. Please let us know if you'd like us to resend or you plan to remove the funds and do it yourself as you stated on the phone.

34. Jon Ebel ("Ebel"), Verivend's Chief Technology Officer, never sent a purported November 20, 2023 email to Claver.

35. The Verivend Domain is "verivend.com" (not "verivend.support") and Ebel's email address is "jon@verivend.com" (not "jon@verivend.support").

36. The purported wire confirmation from Verivend included in the alleged November 20, 2023 email also was fake.

37. Upon information and belief, Claver manufactured the purported November 20, 2023 email from Ebel and fabricated the purported wire transfer confirmation in that email to deceive Schepens.

38. The domain "verivend.support" was registered on or about November 15, 2023 without the permission or authorization of Verivend.

39. Upon information and belief, the "verivend.support" domain was registered by Claver; Claver then used this confusingly similar domain to generate the unauthorized email address "jon@verivend.support" to impersonate Ebel; and using that email account, Claver manufactured a purported wire transfer confirmation by Verivend. Claver then forwarded this fabricated conversation to Schepens.

40. Upon information and belief, when Schepens did not receive the funds, he asked Claver for proof of the wire transfer. On or about November 21, 2023, Claver sent Schepens an image purporting to confirm a transfer authorized by "Rodney Reisdorf," with an "International Wire-Tracking ID" of "3319241," for $875,000.00 from an account named "Settlement XXXXXX7000" to "MONIC SARL."

41. This purported wire confirmation was fake. I did not approve a wire for $875,000 to MONIC SARL.

42. Claver then sent another text message to Schepens. Claver wrote that Verivend "said it was returned because the bank they go thru requires 11 digits for the Swift code and I didnt add the XXX on the end…"

43. Claver's statement is false. This purported communication between Claver and Verivend never happened.

44. In sum, Claver falsely represented to Schepens that wire transfers had been initiated but then delayed or failed as a result of Verivend. Further, Claver supported these misrepresentations by manufacturing fake Verivend emails, wire confirmations, and wallet account images. Upon information and belief, in actuality, Claver did not raise any funds for xSPECTAR using the Verivend platform and never initiated any purported wire transfers from Verivend accounts.

**D.  Verivend Terminates All of Defendants' Accounts After Claver Admits to Misleading Schepens**

45. After receiving the information from Schepens, Verivend immediately commenced an investigation of the allegations.

46. As part of its investigation, Verivend held a video conference with Claver on November 30, 2023 (the "November 30th Conference"). A true and accurate copy of a transcript of the November 30th Conference is attached as **Exhibit G**.

47. During the November 30th Conference, Claver admitted: "I misled [Schepens] and I shouldn't have done that."

48. Claver further stated: "I made promises to [Schepens], and did not raise the money in time, and was being pressured and . . . made poor choices."

49. Verivend informed Claver that "we have shut off all of your access to Verivend because we can't trust this relationship anymore."

50. Verivend further informed Claver that it was going to "sever this relationship, because we can't have you using Verivend in our name to promise and provide information that's not factual to him."

51. By letter dated November 30, 2023, Verivend terminated the Agreement and all accounts related to Defendants. A true and accurate copy of this letter is attached as **Exhibit H**.

**E.  Defendants Falsified Wire Transfers Purportedly from Verivend in Connection with Purportedly Raising Capital for ThroughPut**

52. On or about December 4, 2023, Verivend learned that Claver had used fabricated wire confirmations, purportedly from Verivend, in connection with purportedly raising funds for ThroughPut, Inc. ("ThroughPut").

53. On or about December 4, 2023, the COO of ThroughPut forwarded to Verivend an email that he had received from Claver on November 13, 2023 (the "November 13 Email"). A true and accurate copy of the November 13 Email is attached as **Exhibit I**.

54. The November 13 Email stated: "Please see below wire confirmation" and included an image that appeared to be a screenshot of a wire confirmation.

55. The image in the November 13 Email purported to confirm a wire transfer authorized by "Jon Ebel," with a "Domestic Wire-Tracking ID" of "3303465," for $1,100,000.00 from an account "Settlement XXXXXX7000" to "ThroughPut, Inc."

56. Claver's statements in the November 13 email were false, and the purported wire transfer approved by Verivend was fabricated.

57. There was no wire transfer for $1,100,000.00 authorized by Verivend to ThroughPut on or about November 11, 2023. Further, Ebel's name would not have appeared on such a Verivend wire transfer confirmation, because Ebel did not have access or authority to approve such outgoing wires.

58. Further, upon information and belief, Claver represented to the COO of ThroughPut that additional wire transfers would be made from Defendants' Verivend accounts during the week of December 4, 2023.

59. Claver's statement is false. Verivend had closed Defendants' accounts on November 30, 2023, and therefore Defendants could not send any wire transfers using Verivend during the week of December 4, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 14, 2023
      Buffalo, New York

_____
RODNEY R. REISDORF